STATE of Utah, By and Through the DIVISION OF CONSUMER PROTECTION, Jean A. Williams, Director, Plaintiff and Appellant,

v.

GAF CORPORATION, a Delaware corporation, Defendant and Appellee.

No. 19836.

Supreme Court of Utah.

Aug. 18, 1988.

David L. Wilkinson, Neal T. Gooch, Salt Lake City, for plaintiff and appellant.

J. Rand Hirschi, Salt Lake City, for defendant and appellee.

STEWART, Justice:

The State Division of Consumer Protection (the "Division") appeals from a summary judgment against it in a civil action brought by the Division against GAF Corporation ("GAF"). The Division's complaint alleges that GAF committed a deceptive act or practice against a Utah consumer in violation of the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1 to -23 (Supp.1983). The trial court ruled that (1) the Division could not sue for damages to a consumer based on a complaint filed by the consumer with the Division, (2) a builder who sold the GAF product to the consumer and who allegedly made express warranties about GAF products was not an authorized agent of GAF, and (3) GAF's liability is limited by the terms of its own written warranty.

We take the following statement of facts primarily from Dr. Dewey MacKay's deposition. In June, 1974, Dr. MacKay contacted Pendleton Builders to discuss the installation of a new roof for his home. During the negotiations, Pendleton Builders showed MacKay an asphalt shingle made by GAF called the Slate Blend Timberline shingle ("Timberline"). MacKay was also shown GAF promotional materials about asphalt shingles, including pictures of a house newly roofed with GAF shingles.

Either Pendleton Builders or its subcontractor told MacKay that the Timberline was GAF's top-of-the-line, self-sealing shingle, which carried a twenty-five-year guarantee and was made of the highest quality

asphalt. MacKay also testified that the GAF advertising materials he saw contained representations that the Timberline shingle roof was "a 25–year roof." He thought that meant that GAF would remedy any defects in the shingles that appeared within twenty-five years. Based on these representations, MacKay purchased Timberline shingles and had them installed on his home by a subcontractor of Pendleton Builders.

In May or June, 1981, MacKay noticed that the shingles had not sealed properly and had begun to curl. MacKay contacted a GAF representative who went to MacKay's home and took samples of the shingles for testing. The tests showed that the shingles were defective at the time of installation.

MacKay testified that he was not informed by GAF until after the shingles were tested that GAF's liability was limited by its written "Asphalt Shingle Warranty," which limits GAF's liability to "$25.00 per square subject to 4% annual reduction of liability each successive year at the life of the bond." In this case that liability would total $720. The warranty also states that the Timberline shingle is a "25–year bond" shingle. MacKay does not remember receiving a copy of the written warranty prior to the installation or to discovering the defective condition of the shingles. The estimated cost to repair the roof was $8,000.

After discovering that GAF's written warranty purported to limit its liability, MacKay complained to the Division. The Division investigated the complaint and, on September 23, 1983, filed a lawsuit alleging that GAF had participated in a deceptive act or practice forbidden by the Utah Consumer Sales Practices Act (the "Act").

### I.

We first consider whether the Division complied with the terms of the governing statute in filing this lawsuit. In its complaint, the Division asserted that it was "charged with the enforcement and administration of the [Consumer Sales Practices] Act pursuant to ... Utah Code Ann.

§ 13–11–7 and Utah Code Ann. § 13–11–17 (Supp.1983)." GAF argues, and the trial court held, that under § 13–11–17(1)(c), as amended in 1983, the Division is authorized to recover damages only for those consumers who file complaints with the Division *after* the Division has already instituted an action against a defendant. As shown below, that construction of the statute would essentially eviscerate the Act and defeat the evident legislative objective of providing an effective remedy to consumers who have purchased defective products and who often have no practical private remedy because of the small amounts of money lost and the cost of pursuing legal proceedings. Indeed, the statutory scheme contemplates that the Division will act at the behest of consumers. The Act specifically provides, "the enforcing authority shall ... receive and act on complaints." Utah Code Ann. § 13–11–7(1)(d) (Supp.1988).

Prior to 1983, § 13–11–17(1)(c) read as follows:

(1) The enforcing authority may bring an action:

. . . .

(c) To recover actual damages, or obtain relief under subsection (2)(b) on behalf of consumers who complained to the enforcing authority before he instituted proceedings under this act.

Utah Code Ann. § 13–11–17(1)(c) (Supp. 1981). Subparagraph (c) of § 13–11–17(1) was amended in 1983. We set out the amended version in the full context of subsection (1):

(1) The enforcing authority may bring an action:

(a) to obtain a declaratory judgment that an act or practice violates this chapter;

(b) to enjoin, in accordance with the principles of equity, a supplier who has violated, is violating, or is otherwise likely to violate this chapter; and

(c) to recover, for each violation, actual damages, or obtain relief under Subsection (2)(b), on behalf of consumers who complained to the enforcing authori-

ty within a reasonable time after it instituted proceedings under this chapter.

Utah Code Ann. § 13–11–17(1) (1986).

It is axiomatic that a statute should be given a reasonable and sensible construction, *Curtis v. Harmon Elec. Inc.*, 575 P.2d 1044, 1046 (Utah 1978), and that the legislature did not intend an absurd or unreasonable result. *Millett v. Clark Clinic Corp.*, 609 P.2d 934, 936 (Utah 1980). Subsection (1) explicitly authorizes the Division to obtain three types of remedies: declaratory judgments, injunctions, and damages "on behalf of consumers." As construed by the trial court, the Division must act on its own initiative in filing a complaint, and once it has done that, it may then, and only then, press the claims of consumers who have been taken advantage of. As a practical matter, the trial court's reading of the statute would subvert the purpose of the Act and result in a nonsensical enforcement scheme, with the result that if a consumer complained to the Division *before* rather than after it commenced an action, the Division could not recover damages for that consumer. That result would contravene the stated purpose of the Act, which is "to protect consumers from suppliers who commit deceptive and unconscionable sales practices." Utah Code Ann. § 13–11–2(2) (1986).

■ The 1983 amendment is more reasonably construed as a remedial measure to extend the time limit for complaining to the Division to obtain the benefits of a damage action brought by the Division. Prior to the 1983 amendment, the Division could bring an action for damages only on behalf of those consumers who complained to the Division *before* the Division instituted an action against a supplier. Once the Division had initiated proceedings, it had to file a new action for subsequent consumer complaints concerning the same product. That limitation was unnecessary and burdensome to the Division and the courts. Thus, the amendment to § 13–11–17(1)(c) merely allowed additional consumers to join a pending action within "a reasonable time" after commencement of proceedings.

## II.

■ The next issue is whether the Division stated a valid claim on which relief can be granted. In its first claim for relief, the Division alleged that GAF "indicated to Dr. MacKay that its Slate Blend Timberline shingle was a top-of-the-line, high quality, self-sealing shingle with a product life of at least 25 years," but that the shingles actually supplied to MacKay, although Timberline shingles, "were of an inferior quality and defective." On that basis, the Division alleged that GAF violated § 13–11–4(2)(b) (Supp.1983), which states:

> (2) [T]he following acts or practices of a supplier or the following indications by a supplier are deceptive:
>
> ....
>
> (b) That the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not....

The Division does not allege that GAF knew the shingles were defective when they were sold to MacKay. On the contrary, it is undisputed, at least at this point, that GAF was unaware of the defective condition of the shingles until 1981. That, however, does not defeat the Division's claim for relief.

The Utah Consumer Sales Practices Act was modeled after the Uniform Consumer Sales Practices Act. Section 13–11–4 of the Utah Act was amended in 1985 to require "intent to deceive" on the part of a supplier before a deceptive trade practice can be found. *See* Utah Code Ann. § 13–11–4 (Supp.1988). However, the earlier version of the Utah Act, applicable in this case, contained no intent requirement. Indeed, the express intention of the drafters of the Uniform Act was not to require intent to deceive. According to the official comment to the Uniform Act, "The acts and practices listed in this subsection are treated as *per se* deceptive." Uniform Consumer Sales Practices Act § 3(b), 7A U.L.A. 237 (1985). *See also Riley v. Enterprise Furniture*, 54 Ohio Misc. 1, 375 N.E. 2d 821 (1977). The Act allowed consumers to recover for a deceptive practice without showing intent to deceive. Because no in-

tent is required under the version of § 13–11–4 that controls here, the Division's allegation that the shingles sold Dr. MacKay were of the Timberline type and of a particular quality, when they were of an inferior quality, states a valid claim for relief.

■ The Division's second cause of action is based on § 13–11–4(2)(j) (Supp.1983), which reads:

(2) [T]he following acts or practices of a supplier or the following indications by a supplier are deceptive:

. . . .

(j) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies, or obligations if the indication is false. . . .

The Division claims that GAF through its literature or agent made an express warranty to MacKay in 1974 and later tried to disclaim or ignore that warranty and supplant it with GAF's limited written warranty. In our view, that allegation states a cause for relief under § 13–11–4(2)(j).

■ GAF argues that even if the Division's allegations make out claims for relief under the Act, those claims should have been brought against Pendleton Builders and not GAF since Pendleton Builders did not have apparent authority to make binding representations concerning GAF products. GAF relies on the rule stated in *City Elec. v. Dean Evans Chrysler–Plymouth*, 672 P.2d 89, 90 (Utah 1983):

It is well settled law that the apparent or ostensible authority of an agent can be inferred only from the acts and conduct of the principal. . . . Where corporate liability is sought for acts of its agent under apparent authority, liability is premised upon the corporation's knowledge of and acquiescence in the conduct of its agent which has led third parties to rely upon the agent's actions.

(Citations omitted.)

The Division admits that GAF knew nothing about the existence of Pendleton Builders or any warranty it may have given to MacKay until seven years after the fact. Nevertheless, the Division relies on the promotional materials supplied by GAF to retailers as a basis for finding apparent authority. As a general rule, Pendleton's statements cannot be imputed to GAF unless GAF knew of or acquiesced in Pendleton's statements. Merely providing promotional materials to Pendleton is not sufficient to establish GAF's liability for Pendleton's statements on a theory of apparent authority. To the extent the Division's claims against GAF are based on representations made by Pendleton Builders or its subcontractor, they fail to state a claim.

■ Nonetheless, the Division has stated a claim against GAF under both § 13–11–4(2)(b) and (j), based on the allegations that the GAF promotional materials themselves contained representations about the quality of the shingles, and that is so, irrespective of whether GAF was in privity with Dr. MacKay. Dr. MacKay testified in his deposition that the GAF promotional materials provided to him contained "[p]ictures of roofs and statements as to various grades and that this was a 25–year roof." Although the record does not contain the GAF promotional materials that were provided to him, if they contained representations about the quality of the shingles, those representations can constitute express warranties under Utah law. Under the Utah Uniform Commercial Code, an express warranty can be created in one of three ways:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Utah Code Ann. § 70A-2-313 (1980). Statements made about a product in promotional materials fall under subsections(a) or (b), since advertising materials provided by retailers to consumers can form the basis of an express warranty if the statements made in those media form a "part of the basis of the bargain." *See Ferguson v. Sturm Ruger & Co.*, 524 F.Supp. 1042, 1046 (D.Conn.1981); *Jensen v. Seigel Mobile Homes Group*, 105 Idaho 189, 195, 668 P.2d 65, 71 (1983); *Mennonite Deaconess Home & Hosp. v. Gates Eng'g*, 219 Neb. 303, 310-12, 363 N.W.2d 155, 162-63 (1985).

An affirmation of fact, a promise, or a description of the goods must be judged objectively against the meaning that a reasonable person would have taken from the statement. "If it is reasonable to conclude that a reasonable person would have ventured into the transaction on the basis of a particular statement," an express warranty was made. 3 R. Anderson, *Anderson on the Uniform Commercial Code*, § 2-313:50, at 44 (3d ed. 1983). In determining reasonableness, a court should consider such factors, among others, as "(1) the ability of the buyer to see and understand for himself, (2) the vagueness of the statement, and (3) the incredibility of the statement." *Id.* Actual reliance on the statement need not be shown, however; the statement need only form a "part of the basis of the bargain." Utah Code Ann. § 70A-2-313; *Jensen*, 105 Idaho at 194-95, 668 P.2d at 71; *Autzen v. John C. Taylor Lumber Sales*, 280 Or. 783, 788-89, 572 P.2d 1322, 1324-25 (1977).

■ Finally, it is appropriate to observe, since this case must be remanded, that if the promotional materials distributed by GAF in fact contained an express warranty, "the great weight of authority and the better view is that a consumer can recover for breach of an express warranty despite a lack of privity." 2 L. Frumer & M. Friedman, *Products Liability*, § 302[9] at 3-303 (1987) (footnote omitted). The basis for that liability was well explained in *Baxter v. Ford Motor Co.*, 168 Wash. 456, 462-63, 12 P.2d 409, 412 (1932):

Radio, billboards, and the products of the printing press have become the means of creating a large part of the demand that causes goods to depart from factories to the ultimate consumer. It would be unjust to recognize a rule that would permit manufacturers of goods to create a demand for their products by representing that they possess qualities which they, in fact, do not possess, and then, because there is no privity of contract existing between the consumer and the manufacturer, deny the consumer the right to recover if damages result from the absence of those qualities, when such absence is not readily noticeable.

On this principle, courts have held manufacturers responsible for a variety of express warranties found in sales literature. For example, in *Ford Motor Co. v. Lemieux Lumber Co.*, 418 S.W.2d 909 (Tex.Civ. Ct.App.1967), the court held that a sales brochure which indicated by pictures that the defendant's truck was capable of crossing streams and ditches and climbing mountains could be construed as an express warranty. *See also Sylvestri v. Warner & Swasey Co.*, 398 F.2d 598, 602 (2d Cir.1968) (a brochure picture constituted an express warranty that a backhoe could be used for lifting a rock as plaintiff used it.)

Clearly, Dr. MacKay's testimony, assuming its validity as we must upon review of the summary judgment, establishes a prima facie case that the promotional materials contained one or more express warranties. Summary judgment was, therefore, inappropriate on the record before the trial court. *See Gadd v. Olson*, 685 P.2d 1041, 1043 (Utah 1984); *Frisbee v. K & K Constr.*, 676 P.2d 387 (Utah 1984).

Reversed and remanded for further proceedings.

HALL, C.J., HOWE, Associate C.J., and DURHAM, ZIMMERMAN, JJ., concur.